## LUCIUS R. WILLIAMS *vs.* FREDERICK A. SWEET.

### York.   Opinion June 5, 1920.

*Contract.   Breach of contract justified.   House flies carriers of death-dealing disease germs.   An implied promise that a dining service at a hotel should be reasonably free from insanitary conditions.   Verdict manifestly wrong.*

This case comes up on exceptions and motion, but the exceptions are waived. The case involves a contract whereby the defendant agreed to take and pay for certain rooms in the plaintiff's hotel for two weeks from the second day of August, 1918, but left on the fifth day.

This action is upon the contract to recover the full contract price for two weeks. The crux of the case is found in answer to the inquiry. Was the defendant justified in leaving the hotel on account of the fault of the plaintiff in allowing flies to collect at the defendant's table in such numbers as to become unsanitary and repulsive? We think he was. The house fly is now attracting the serious attention of sanitary and health departments all over the country; in fact, all over the world. The danger with which his presence is fraught is also a matter of common knowledge and hence of judicial notice. L. O. Howard, M. D., Ph. D., LL. D., in the third edition of his treatise on The House Fly, Disease Carrier, says that within the last twelve years the dangerous character of the common house fly has been known and that within the last two years articles relative to the so-called house fly in connection with its disease carrying possibilities have been published literally by the thousands, and this interest perhaps having its origin in the United States has spread to nearly all parts of the civilized world, and yet in no one of these published articles is the whole story told.

We find also that the bibliographical list upon this subject in the last twelve years embraces 136 publications in books and bulletins issued in many countries and printed in different languages. We might indefinitely cite publications from Italy, France, Germany, and probably every State in the Union, and it is safe to say from nearly every medical society in this country and from the great hospitals, each approaching the subject from a somewhat different angle but all concurring in the final opinion that the common house fly is one of the most, if not the most dangerous and insidious agencies in the communication of many of the most dreaded and most fatal diseases.

We have not, yet, however referred to the literature and attitude of our own State toward this disreputable intruder. Our publications are in the form of official bulletins issued by the State Board of Health of Maine. While this subject was discussed in a meeting of the State Department of Health on the 27th of April

last, and while the State publications thereon are numerous, we deem it necessary to insert one document, which, in clear, unvarnished language summarizes the offensive and dangerous characteristics and habits of the house fly. This document is official and with caption in full reads as follows:

"Health of Home and School Leaflet No. 38

Issued by the State Board of Health of Maine

Flies are the most dangerous insects known to men.

Flies are the filthiest of all vermin. They are born in filth, live on filth, and carry filth around with them. They are maggots before they are flies.

Flies are known to be carriers of death-dealing disease germs.

They leave some of these germs wherever they alight.

Flies may infect the food you eat. They come to your kitchen or to your dining table, fresh from the privy vault, from the garbage box, from the manure pile, from the cuspidor, from decaying animal or vegetable matter, or from the contagious sick room with this sort of filth on their feet and in their bodies, and they deposit it on your food, and *you do* swallow filth from privy vaults, etc. etc., if you eat food that has come in contact with flies.

Flies may infect you with tuberculosis, typhoid fever, scarlet fever, diphtheria, and other infectious diseases. They have the habit of feasting on tuberculous sputum and other discharges of those sick with these diseases, and then go direct to your food, to your drink, to the lips of your sleeping child, or perhaps to a small open wound on your hands or face. When germs are deposited in milk they multiply very fast, therefore milk should never be exposed to flies."

We offer no apology for inserting the expressive language above used. We have inserted the document unexpurgated because it speaks a bald truth of which the community should be fully informed.

Our conclusion is that under the evidence, the defendant was fully justified in leaving this hotel in view of the implied duty on the part of the plaintiff to provide the defendant and his party, as his guests, a dining service that was reasonably free from unsanitary conditions having in mind at all times upon the question of reasonableness, the particular dangers that are now well known to be effective in causing such conditions, and the verdict of the jury to the contrary was manifestly wrong. Reasonable care is always measured by the imminence of the danger to be avoided. Reasonable conditions of sanitation are likewise always to be measured by the fatality of the diseases liable to be communicated as the result of the lack of such conditions. It might be improvident to expose one to the germs of measles, but it would be a base and degenerate act to knowingly tolerate conditions that would tend to the communication of a fatal disease.

On motion and exceptions. Assumpsit to recover on a contract made by defendant with plaintiff under the terms of which defendant agreed to take and pay for certain rooms in the plaintiff's hotel for two weeks from the second day of August, 1918, but left on the fifth day.

The action was brought in the municipal court of the city of Biddeford. Defendant filed a plea of the general issue, and also a brief statement, alleging that plaintiff waived the original contract and substituted another contract·in lieu thereof. The court found for the plaintiff and defendant appealed to the Supreme Judicial Court, where the case was tried to a jury and a verdict of $128.78 was returned.

At the close of the evidence defendant requested the presiding Justice to direct a verdict for the defendant, which was refused, and defendant took exceptions. The case was taken to the Law Court on a motion to set aside the verdict, and on the exceptions, but the exceptions were waived. Motion sustained. New trial granted.

Case stated in the opinion.

*Ray P. Hanscom*, for plaintiff.

*E. P. Spinney*, for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, DUNN, WILSON, DEASY, JJ.

SPEAR, J. 1. The exceptions were waived. 2. There is no doubt about the terms and completion of the alleged original contract. The correspondence confirms it. The defendant carried it into execution by the occupancy of the rooms reserved. Nor is there any question that the defendant infringed the terms of the contract. But infringement of a contract may or may not be a violation of the obligation imposed by it. The defendant agreed to take and pay for the rooms in question for two weeks from the second day of August in 1918, but left them on the fifth day.

This action is upon the contract to recover the contract price for two weeks. The defendant tendered the regular transient rates for the time he and his party were at the hotel. The crux of the case is found in answer to the inquiry: Was the defendant justified in leaving?

It will be conceded that a hotel, when it holds itself out to the public as a place of resort for rooms and board, carries with such offer an implication that it will furnish its patrons with accommodations that are compatible with the standing of the hostelry, the prices paid and the class of people invited to become its guests. These accommodations include apartments, table, dining service and especially such

sanitary conditions as are calculated to render the surroundings inviting and wholesome rather than repulsive and deleterious to health.

The complaint in this case is not as to accommodations, the quality or quantity of food or the merits of the table, the theory upon which the case was at least partially tried, thereby diverting the minds of the jury from the real issue, but that at the table at which the defendant and his party were accustomed to sit the flies were so numerous and became so obnoxious, that their presence created an intolerable condition in violation of the obligation of the landlord to furnish suitable and sanitary dining facilities as implied in his contract.

The real issue involves a single question of fact: Was the defendant justified in leaving the hotel on account of the fault of the plaintiff, in allowing flies to collect at the defendant's table in such numbers as to become unsanitary and repulsive? We think he was. It is a matter of common knowledge that the common house fly has come to be regarded by the enlightened understanding not only as one of the most annoying and repulsive of insects, but one of the most dangerous in his capacity to gather, carry and disseminate the germs of disease. He is the meanest of all scavengers. He delights in reveling in all kinds of filth, the greater the putrescence the more to his taste. Of every vermin, he above all others is least able to prove an alibi when charged with having been in touch with every kind of corruption, and with having become contaminated with the germs thereof. After free indulgence in the cesspools of disease and filth he then possesses the further obnoxious attribute of being most agile and persistent in ability to distribute the germs of almost every deadly form of contagion.

It is a matter of common knowledge that yellow fever was formerly the scourge of certain localities in our own and other countries. For years no one mistrusted or was able to detect the cause. But one day it was announced that a certain kind of mosquito, by his sting, communicated the germs of this dread disease. The knowing introduction of one of these mosquitos now would constitute a criminal offense. While the house fly has not yet been regarded as fatal as a mosquito, he, nevertheless, is now attracting the serious attention of sanitary and health departments all over the country; in fact all over the world. The dangers with which his presence is fraught is also a matter of common knowledge and hence of judicial notice.

L. O. Howard, M. D., Ph. D. LL. D., in the third edition of his treatise on The House Fly, Disease Carrier, says "that within the last twelve years the dangerous character of the common house fly has been known. And that within the last two years articles relative to the so-called house fly in connection with its disease carrying possibilities have been published literally by the thousands and this interest perhaps having its origin in the United States, has spread to nearly all parts of the civilized world and yet in no one of these published articles is the whole story told." (The last two years referred to were from 1909 to 1911).

We find also that the bibliographical list upon this subject in the last twelve years embraces 136 publications in books and bulletins issued in many countries and printed in different languages. We mention a few authors and their subjects to show that there is no dissenting opinion as to the germ spreading powers of this loathesome insect. Ainsworth, R. B. (1909)   The House Fly as a disease carrier. Journal Royal Medical Corps.   Cobb, J. O. (1905).   Is the Common House Fly a Factor in the Spread of Tuberculosis?   American Medicine IX. Dutton, W. F. (1909) Insect Carriers of Typhoid Fever.   American Med. Assoc. LIII.   Felt, E. P. (1910) The Typhoid House Fly and Disease.   24th Rept. State Entomologist of N. Y.   Fraggatt (1910) The House Fly and the Disease it Spreads.   Agric. Gazette, New South Wales.   Ficker M. (1903) Typheus Fliegen.   Arch. f. Hyg., XLVI.   The Fly as a carrier of Tuberculosis, Haywood E. H. (1904) N. Y. Medical Journal LXX.   Jackson D. D. (1907) Report to Committee on Pollution.

Thus we might go on almost indefinitely citing publications from Italy, France, Germany and probably every State in the Union, and it is safe to say from nearly every medical society in this country and from the great hospitals each approaching the subject from a somewhat different angle but all concurring in the final opinion that the common house fly is one of the most, if not the most, dangerous and insidious agencies in the communication of many of the most dreaded and most fatal diseases.

So dangerous has the house fly become as the communicant of typhoid that L. O. Howard to whom we have referred who was an officer in the Division of Entomology U. S. Agric. Dept. proposed, at a meeting of the committee of 100 on the public health, that "the name typhoid fly be substituted for the name house fly now in general

use." He further says: "As a matter of fact this name has been adopted only generally. The newspapers took it up with avidity." It seems that Dr. Styles of U. S. Public Health and Marine Hospital Service at the same meeting suggested the name "filth fly." We have cited these publications, many of them of an official character and all of them of a public nature, to prove beyond question that the common house fly, his nature and character are matters of common knowledge.

We have not yet, however, referred to the literature and attitude of our own State toward this disreputable intruder. Our publications are in the form of official bulletins issued by the State Board of Health of Maine. While this subject was discussed in a meeting of the State Department of Health on the 27th of April last and while the State publications thereon are numerous we deem it necessary to insert one document, which, in clear unvarnished language summarizes the offensive and dangerous characteristics and habits of the house fly. This document is official and with caption in full reads as follows:

"HEALTH OF HOME AND SCHOOL LEAFLET No. 38

Issued by the State Board of Health of Maine

Flies are the most dangerous insects known to man.

Flies are the filthiest of all vermin. They are born in filth, live on filth, and carry filth around with them. They are maggots before they are flies.

Flies are known to be carriers of death-dealing disease germs.

They leave some of these germs wherever they alight.

Flies may infect the food you eat. They come to your kitchen or to your dining table, fresh from the privy vault, from the garbage box, from the manure pile, from the cuspidor, from decaying animal or vegetable matter, or from the contagious sick room with this sort of filth on their feet and in their bodies, and they deposit it on your food, and *you do* swallow filth from privy vaults, etc. etc., if you eat food that has come in contact with flies.

Flies may infect you with tuberculosis, typhoid fever, scarlet fever, diphtheria, and other infectious diseases. They have the habit of feasting on tuberculous sputum and other discharges of those sick

with these diseases, and then go direct to your food, to your drink, to the lips of your sleeping child, or perhaps to a small open wound on your hands or face. When germs are deposited in milk they multiply very fast, therefore milk should never be exposed to flies."

We offer no apology for inserting the expressive language above used. We have inserted the document unexpurgated because it speaks a bald truth of which the community should be fully informed.

We now come to the question of whether defendant was justified in leaving the hotel on account of the presence of flies at his table. The case starts out with the admitted fact that the defendant had spent the previous season at the plaintiff's hotel and found it entirely satisfactory as shown by the undisputed testimony. He wished also to spend the season in question there and made a contract and procured his rooms for that specific purpose. In pursuance of his contract and his purpose, he and his family came and entered upon the prospective enjoyment of their two weeks vacation as they had done the year before. No complaint was made about the character of the rooms, the quality of the food or the efficiency of the service, yet the defendant and his family, after they had become settled for their vacation, put themselves to the inconvenience and trouble of repacking their baggage, leaving the hotel and procuring accommodations elsewhere. It is a general rule that men act from motive. It may be regarded as an axiom that they act from selfish motives, when given a perfectly free choice as to what they will do. We may therefore assume that the defendant in the case at bar did not leave the plaintiff's hotel in violation of his own interests for the mere caprice of moving. What then was the cause of the defendant's departure? By the affirmative, undisputed testimony, the only cause apparent is the one which the defendant assigns, the obnoxious presence of flies. That the defendant left on this account there can be no doubt. We think he was justified in so doing. The plaintiff's depositions together with his own testimony, support the defendant's contention to such an extent as to justify his complaint. Every deponent but one whose depositions were read admitted the presence of some flies in the dining room. But the significant testimony comes from Mildred Bent, the waitress who served the defendant and his guests.

"Q. Did you hear Mr. Sweet say anything about flies in the dining room?

A.   Yes.   He was always saying that there were so many flies that he could not eat.   I heard him say that he could not eat where there were so many flies around him."

Is it then conceivable that this defendant was complaining of flies being so numerous that he could not eat when only two or three of them were in the dining room, especially when he was located there and was in all other respects satisfied?   But the further testimony of this witness practically admits that the defendant's cause of grievance as shown in the following question and answer:

"Q.   How did these flies get in?

A.   Just the same of any flies.   After a rainy day or on a rainy day, they are bound to get in and it is impossible to keep flies out, especially in a hotel where there are so many people going in and out of the doors all of the time."

We now quote from the testimony of the plaintiff himself:

"Q.   Upon the fourth day of August did you have any talk with Mr. Sweet in the green room of your hotel?

A.   Sunday?

Q.   Yes, August fourth.   Friday was the second, that would be Sunday.

A.   Sunday; yes, I did.

Q.   Will you tell us what that conversation was?

A.   Mr. Sweet sent a bell boy out after me, told me he wanted to see me.   I went in and Mr. Sweet was in the green room we call it, and was rather disturbed, and said the flies were so thick in the dining room they couldn't eat their dinner, and that his wife's mother was in such condition, and his wife's sister, that they were nauseated or something like that and it was simply unendurable, that they couldn't eat with the flies around the table.   That is substantially the words that he used."

In the light of the circumstances that Mr. Sweet had every incentive to remain at the hotel, that he should interview the proprietor is also almost inconceivable if there was no ground for complaint.   But what the plaintiff did and found according to his own admission furnishes a foundation for the compaint.   The plaintiff says that on the day of complaint about 20 minutes of six that night, he went into the dining room with a folded newspaper and killed all the flies he could see in there.

"Q. How many did you find in the dining room if you can tell us?

A. I don't know exactly. You said twenty, but I don't think I killed twenty flies. Perhaps 15 or 18."

This testimony of the plaintiff himself proves two things; 1. that the defendant was so annoyed by flies that he felt compelled to send for and complain to the proprietor. 2. that many flies were actually in the dining room.

We may now turn to the testimony of the defendant. The defendant was 41 years old and a teacher in the Worcester High School, a position requiring a man of responsibility and character. His testimony in regard to the presence of flies is as follows:

"Q. When you got there will you tell the jury what conditions you found in regard to the dining room?

A. When we arrived Friday evening we went in to supper and found that flies were quite numerous, and we remarked the fact, one to the other—

THE COURT: State the conditions as you found them.

A. That is the gist of the entire thing. We went in there to supper and I noticed a great number of flies around the dining room, our dining table, on our table. These flies were very annoying; both mentally and physically. They were buzzing around the foods and the reaction caused by their presence was something that wasn't at all agreeable to think about, and I was disgusted by their presence.

Q. When the waiter came in with the food what would you notice in connection with the food? I am now referring to the flies.

A. I noticed the flies were buzzing around the food and alighting upon the food, and on one occasion particularly I noticed several of the guests were busy brushing them away, and I used my left hand one day to guard the food while I manipulated the eating utensils with my right hand."

Mrs. Sweet, after stating that the conditions in 1917 were satisfactory, testified in regard to the flies as follows:

"Q. What were the conditions?

A. Well, there were flies everywhere on the walls. We were in the corner, and naturally the flies were not in the center of the floor where the waitresses were hurrying back and forth. We were over at one corner; they were all over the walls, ceiling and on our table; my

sister sat at one end of the table where the waitress put the trays on those little racks, and she did that (illustrating) with the napkin to keep the flies off till we got the food."

Mrs. Sweet also says that the dishes were polluted and especially the drinking glasses, as the following question and answer shows:

"Q.   What was there on that glass?

A.   It was all covered with fly specks.

Q.   How did this affect you?

A.   Well, it affected me of course.   I thought, well, it was not like this last year and probably it will be better.   I hoped it would be better because I was so disappointed."

Further along she was asked this question:

"Q.   Were the accommodations at the hotel satisfactory to you?

A.   Everything but the flies."

At this point, it is proper to call attention to one significant fact which is almost controlling with reference to the true interpretation of the evidence in this case, and that is that this hotel was entirely satisfactory to both the defendant and his wife except for the presence of flies at the dining table and that this obnoxious feature was a great disappointment to them.   The defendant's evidence when considered in connection with the plaintiff's and with the circumstances is so overwhelming in favor of the defendant's contentions, that but one reasonable conclusion can be drawn, and that is that the flies around the defendant's table were so numerous as to become not only obnoxious and disgusting but a positive menace to health.   The defendant's table was in a corner of the room where the flies would more naturally congregate upon the walls than around the tables in the center of the room.

But the defendant and his wife say they had no complaint except the flies.   They talked the situation over, and thought the condition but temporary, and concluded not to say anything about it at first. Their testimony which is in perfect harmony with their purpose in coming to the hotel, and of remaining there shows that they had every motive for remaining and it was only when conditions became intolerable on account of flies alone without any prospect of improvement that they felt compelled to break up their plans and move to another place.   Again we repeat that we find no motive whatever inducing the defendant to leave this hotel except the one which his testimony discloses.   This fact alone adds forcibly to the value of his testimony

and is equally derogatory to that of the plaintiff. Accordingly, the circumstances surrounding this case are entitled to very great weight in seeking to ascertain the truth of the situation, as it existed at this hotel during the four days that the defendant and his party were its guests.

And, the admitted circumstances, considered in connection with all the plaintiff's evidence, excluding the defendant's testimony as to the presence of flies, is sufficient in our opinion to warrant the defendant in taking the action he did in leaving the hotel. The plaintiff and all his witnesses but one admit the presence of more or less flies. Accidentally flies may invade any dining room, public or private, but the presence of flies in a dining room regularly in numbers however small are a menace not to be encouraged or tolerated. As before seen, a single fly may so contaminate food, milk or a dish as to communicate a dangerous or even deadly disease like tuberculosis. To the person therefore, who knows its dangers, flies about the food in numbers however small, are at once repulsive, nauseating and dreaded. A single fly may be reeking with filth and covered with a million noxious germs. The danger in the presence of a single fly may be estimated from the following quotation taken from page 84 of a treatise, under the title of Flies and Disease, published by the Cambridge University Press as one of the Cambridge Public Health Series, and edited by G. S. Graham-Smith lecturer in hygiene, Cambridge;

"Flies deposit vomit and faeces on almost every object on which they alight, whether food or not. In feeding, as has been shown already they frequently moisten soluble substances, and often attempt to dissolve insoluble materials with vomit and saliva, and even during feeding have been noticed to deposit faeces. Recently 1102 vomit marks, and 9 faecel deposits were counted on an area six inches square of a cupboard window.

One does not like to think that the fly now walking round the edge of the cream jug was a short time ago regaling its impartial palate on the choicest morsels in the dust-bin, ash-pit or garbage-can, or on more indescribable filth."

We supplement the above pertinent quotation from circular No. 122, "The Filthy Fly as a Disease Carrier," issued by the State Board of Health of Maine:

"Surfaces much exposed to flies become contaminated quickly. The fly specks, so much in evidence in such places are of two kinds, the darker specks consisting of matter which has passed through the fly, and the lighter ones which are the result of an untidy habit of the fly while temporarily resting after gorging himself. It has been observed that he has the trick of returning through his suction tube, drops of the fluid with which he has filled his crop. The drop at the end of his proboscis grows until sometimes it is nearly as large as his head. These drops may be left or they may be sucked up again. Both the light colored specks, the "vomit spots," and the darker ones contain bacteria sometimes in enormous numbers and they may be dangerously infectious if the fly has feasted on typhoid discharges or on tuberculous sputum or other infectious matter."

From the same circular under the caption "The Diseases the Fly May Spread," we find the following, among many others:

"The governmental commission which investigated the serious epidemics of typhoid fever which laid low many of our soldiers during and after the Spanish-American war, reported that the fly was the principal cause.

So far as tuberculosis is concerned, considerations of safety demand that the fly be barred absolutely from everything that is coughed up by the consumptive or discharged by any person who is known or suspected of having tuberculosis. The fly is particularly fond of tuberculosis sputum and after he eats it and excretes tubercle bacilli these germs, it is claimed, may retain their virulence in the fly specks at least fifteen days."

It would hardly seem necessary to proceed further with the quotations of the loathesome evidence necessary to the true exposition of the merits of this case. To those informed upon the subject, this case presents a matter of importance and serious consideration.

Our conclusion is that under the evidence, the defendant was fully justified in leaving this hotel in view of the implied duty on the part of the plaintiff to provide the defendant and his party, as his guests, a dining service that was reasonably free from unsanitary conditions having in mind at all times upon the question of reasonablness, the particular dangers that are now well known to be effective in causing such conditions, and the verdict of the jury to the contrary was manifestly wrong. Reasonable care is always measured by the

imminence of the danger to be avoided. Reasonable conditions of sanitation are likewise always to be measured by the fatality of the diseases liable to be communicated as the result of the lack of such conditions. It might be improvident to expose one to the germs of measles, but it would be a base and degenerate act to knowingly tolerate conditions that would tend to the communication of a fatal disease.

<div align="right">

*Motion sustained.*
*New trial granted.*